UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
VALERIE LEGASPI,

                Plaintiff,                          **MEMORANDUM OF DECISION**
          -against-                               **AND ORDER**
                                                  05 Civ. 1492 (DRH)

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
----------------------------------X

**Appearances:**

**For the Plaintiff:**
Fusco, Brandenstein & Rada, P.C.
180 Froehlich Farm Blvd.
Woodbury, New York 11797
By: John E. Antonowicz, Esq.

**For the Defendant:**
United States Attorney
Eastern District of New York
One Pierrepont Plaza, 14th Fl.
Brooklyn, New York 11201
By: Margaret A. Donaghy, Esq.,

**HURLEY, Senior District Judge:**

       This civil action seeks review of a final determination of the denial by the Commissioner of Social Security of the Plaintiff's application for a period of disability and disability insurance benefits. Plaintiff, Valerie Legaspi ("Plaintiff"), has moved for judgment on the pleadings and Defendant, Jo Anne B. Barnhart, Commissioner of Social Security ("Defendant" or "Commissioner"), has cross-moved for judgment on the pleadings. For the reasons set forth below, Plaintiff's motion is GRANTED to the extent this case is remanded for further administrative proceedings and Defendant's motion is DENIED.

.

## BACKGROUND

### *I. Procedural History*

Plaintiff filed an application for a period of disability and disability insurance benefits on January 28, 2002, alleging an inability to work since December 31, 1990. (Tr. 42-45.)[1] The application was denied by initial determination and a request for hearing was timely filed. (*Id.* 30-34.) A hearing was held on January 12, 2004. (*Id.* at 480-93.) By decision dated January 29, 2004, the ALJ denied the claim for benefits. (*Id.* 11-17.) Thereafter the matter was appealed to the Appeals Council who declined to review the matter. This action ensued.

### *II. Factual Background*

#### *A. Non-medical Evidence*

Plaintiff was born on March 10, 1952, making her almost 52 years old at the time of the hearing. (*Id.* 42.) She has a high school education and completed a course in fashion design in 1976. (*Id.* 61, 483.) She worked as a secretary from 1986 through 1990. (*Id.* 64, 485.) Her last insured date is December 31, 1995.

Plaintiff testified at the hearing that she has experienced headaches since she was eleven years old. (*Id.* 486.) She also testified that she has had chronic fatigue since the early eighties but it was not diagnosed until sometime later. (*Id.*) She testified that she stopped working in 1990 because of fatigue and headaches. (*Id.* 487.) According to Plaintiff, she wakes up with a minor headache generally every day and they get worse depending on her activity. "If I use the phone, if I do physical work like vacuuming or even just rushing around, talking smells, light. They all

---

[1] References to "Tr." are to the Administrative Record filed in this case.

effect my head." (*Id.* 487-88.)   Despite watching her activity, she has migraines roughly three times per week.  (*Id.* 488.)  When she gets a migraine she "crawl[s] in bed . . . and wait[s] for it to blow over," a process that usually takes twenty-four to forty-eight hours.  (*Id.*)

With respect to fatigue, Plaintiff testified that she gets up each day "do[es] [her] basics but [she] hardly [has] the energy to do even errands or clean [her] house or make any kind of commitment whatsoever.  Even if [she has] to make an important phone call [she's] too fatigued, like a lot of physical activity." (*Id.* 489.)  She also has lower back, neck and shoulder problems.  (*Id.* 490.)  She testified that she can only sit for one-half hour, stand for about fifteen minutes, walk for about six blocks and lift approximately five pounds.  She has a license but has problems driving.  (*Id.* 491-92.)  She shops by herself when she can, but stocks up on pantry and frozen items.  (*Id.* 492.)

According to Plaintiff her overall condition has gotten worse since her alleged onset date of December 31, 1990. (*Id.* 491.)

### B.  *Medical Evidence*

Plaintiff did not submit any medical evidence for the period prior to December 31, 2005.  She did, however, begin treatment with Dr. Paul Capobianco on January 20, 1996, less than three weeks after her insured status expired.  Dr. Capobianco's records were submitted to the ALJ.  Dr. Capobianco's notes for her first visit reflect Plaintiff's complaint of migraines since age 11 and long-standing complaints of low energy.  The notes also recite that Plaintiff attempted treatment by nontraditional means – such as acupuncture, kinesiology and holistic medicine – for several years prior to her visit.  (*Id.* 311-12.)   Plaintiff's blood tests were positive for Epstein-Barr virus. (*Id.* 297, 305.)  Severe, debilitating migraines and chronic fatigue are noted

consistently throughout Dr. Capobianco's progress notes. (*Id.* 233- 310 *passim*.)

An MRI of Plaintiff's cervical spine taken on March 4, 1999 showed degenerative changes causing mild stenosis and left C4-5 herniated disc. (*Id.* 239.) Plaintiff saw Dr. Irwin Blau on July 26, 1999 and his notes reflect her complaint that she had experienced migraines for as long as she could remember but that they had increased recently to several times a week. (*Id.* 97-98.) An MRI on August 19, 1999 was normal, as were a carotid sonogram and BAER. (*Id.* 88-97.) From August 26, 1999 through September 6, 2000 she saw Dr. Enrico Fazzini who performed botox injections for her headaches. (*Id.* 100-07.)

In February 2001, Plaintiff saw Dr. Blanck, a neurologist, who increased Plaintiff's Elavil and Imitrex dosages. Although his notes reflect that initially Plaintiff had a dramatic reduction in headaches as a result in the change in dosage, by August he reports that Plaintiff complained of migraines of increasing severity. (*Id.* 184-87.)

In August 2002, Plaintiff began seeing Dr. Susan Jensen. Dr. Jensen's notes state that her physical examination of Plaintiff revealed extraordinary torsion of the cervical facet joints, severe tenderness and spasm of multiple muscles in the head and neck, increased sensitivity at C1 through C5 and T2 through T5, tenderness and spasm at T3 through T5, a positive Tinel's sign on the right and very strong positive Spurling's maneuver bilaterally. (*Id.* 372-381.) An MRI performed on March 17, 2003 at Dr. Jensen's request showed a herniated disc at C3-4, moderate central canal stenosis at C4-5, anterior and posterior osteophytes with severe left and moderate right neural foraminal stenosis at C5-6, anterior and posterior osteophytes with severe right and moderate left neural foraminal stenosis at C5-6, anterior and posterior osteophytes with mild central canal stenosis and severe bilateral neural foraminal stenosis at C6-7.

Dr. Capobianco was the only physician to offer opinions on Plaintiff's capacity to perform work related activities. On March 15, 2002, Dr. Capobianco completed a functional capacity questionnaire. Plaintiff's current symptoms were headache, chronic migraines, chronic fatigue and chronic pain in her neck, lower bak, left hip and both knees. Dr. Capobianco opined that Plaintiff could sit less than six hours a day, stand for less than two hours a day and lift or carry twenty pounds occasionally.

On April 1, 2002, Dr. Capobianco completed a narrative report on his at least monthly treatment of Plaintiff since January 22, 1996. The narrative reads, in pertinent part, as follows:

> Valerie has had migraines since age 11. These migraines, headaches and chronic fatigue have been disabling. I don't think I have ever seen a patient with as bad migraines as she has. This life has left her unable to have the quality of life of most of her peers and family, and has curtailed a lot of opportunities for her. She hasn't held a job for years before I even saw her as a patient. She really spends a lot of time in bed, and at home, and hasn't been able to travel or socialize much.
> 	Specifically she complains of daily headaches (pain scale 5/10), nearly daily migraines (4 times a week pain scale 10/10) very severe pain, chronic fatigue syndrome, chronic pain (constant 5/10) . . . . She has been treated by me on a musculosketal approach since 1-22-96 at least monthly or so. She has also been to many other doctors over the years to help her with her pain. She has been on many medicines over the years . . . . She has also tried many forms of complementary medicine including homeopathy, acupuncture, chiropractic, herbal, a dentist migraine specialist, massage therapy, shiatsu and kinesiology. All without major long term effects. I have helped her with many acute situations, but as of late there has been no major change in her overall condition. She states her condition has gotten much worse lately as she has approached menopause.
> 	I feel her subjective complaints do conform to her objective diagnoses that have been given and treated by the various physicians. All the medicines she in on are palliative for her pain situations, but have not really cut the frequency of her attacks. And her overall malaise and fatigue have not improved from medicine.

> I do not feel she is [sic] has any emotional overlay . . . . I do feel
> her degree of nearly lifelong suffering has extensively limited her
> quality of life, and thus greatly saddened her at times. Her
> prognosis is indeterminate at this time. I feel that she really hasn't
> improved a lot on the whole chronic state, and I am not sure if she
> will be having any breakthrough in the near future. . . .
> I do feel that most definitely knowing Valerie for all these
> years, that she does have disabling medical problems. She has
> never been able to work in all this time I have known her because
> of her symptoms. . . .

(*Id.* 202-03.)

Dr. Capobianco also completed a medical assessment wherein he opined that Plaintiff could lift or carry twenty pounds occasionally and up to ten pounds frequently, stand or walk for one half hour per day or sit for up to two hours per day. Plaintiff could climb, stoop, kneel and crouch occasionally. Her ability to feel, reach, handle, push or pull were restricted. According to Dr. Capobianco, Plaintiff's nearly daily migraines prevented her from functioning for a sustained amount of time and that she has to recline for most of the day. (*Id.* 199-201.)

## DISCUSSION

**I.**   *Standard of Review*

    *A.*   *Review of the ALJ's Decision*

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court may set aside a determination of the ALJ only if it "based upon legal error or is not supported by substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks and citation omitted). "Substantial evidence is 'more than a

mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.'" *Jasinski v. Barnhart,* 341 F.3d 182, 184 (2d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case de novo. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks and citation omitted).

### B. *Eligibility for Disability Benefits*

To be eligible for disability benefits under the Social Security Act (the "SSA"), a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims. *See* 20 C.F.R. § 404.1520. This Circuit has described the procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in

7

> Appendix 1 of the regulations. If the claimant has such an
> impairment, the [Commissioner] will consider him disabled
> without considering vocational factors such as age, education, and
> work experience . . . . Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's
> severe impairment, he has the residual functional capacity to
> perform his past work. Finally, if the claimant is unable to perform
> his past work, the [Commissioner] then determines whether there
> is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working. *Green-Younger v. Barhart*, 335 F.3d 99, 106 (2d Cir. 2003).

### C. The Treating Physician Rule

Social Security regulations require that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa,* 168 F.3d at 78-79. The "treating physician rule" does not apply, however, when the treating physician's opinion is inconsistent with the other substantial evidence in the record, "such as the opinions of other medical experts." *Halloran,* 362 F.3d at 32; *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). When the treating physician's opinion is not given controlling weight, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." *Halloran,* 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). These factors include: (1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4)

whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion. *Id.* § 404.1527(d)(2)(I-ii) & (d)(3-6); *see also Halloran*, 362 F.3d at 32. Furthermore, when giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with good reasons for doing so. 20 C.F.R. § 404.1527(d)(2).

### D. The ALJ's Obligation to Develop the Record

It is a rule in the Second Circuit that "'the ALJ, unlike a judge in a trial, must herself affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982)). As the *Pratt* Court explained: "This duty arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination . . . and exists even when, as here, the claimant is represented by counsel." 94 F.3d at 37 (internal citations omitted).

An "ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own findings that the record is inadequate or the ALJ's reliance on an expert's conclusions that the evidence is ambiguous." *Webb v. Barnhart,* 433 F.3d 683, 687 (9th Cir. 2005). This duty includes seeking additional information from a treating physician when there are gaps in the administrative record. *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999). "[E]ven if clinical findings were inadequate, it [is] the ALJ's duty to seek additional information from the [treating physician] *sua sponte."* *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir. 1998). *Cf. Perez v. Chater,* 77 F.3d 41, 47 (2d Cir. 1996) (where there are deficiencies in the record an ALJ is under an affirmative obligation to develop a claimant's medical history).

9

## II. The ALJ's Decision

Noting that the Plaintiff had "failed to present medical evidence to support her contentions with regard to the period from December 31, 1990 (the alleged disability onset date) through December 31, 1995 (when she was last insured)," the AlJ determined that without evidence to support the claimant's allegations, a claimant cannot be found to have a severe impairment. (Tr. at 15.) Thus, according to the ALJ, Plaintiff failed to sustain her burden at step 2 of the process.

## III. The Parties' Arguments

Plaintiff argues that she is entitled to judgment on the pleadings because the ALJ failed to consider medical source statement from plaintiff's treating physician, incorrectly found that the plaintiff's impairment was not severe as of the date last insured and failed to fully develop the record. Specifically, Plaintiff argues that medical evidence dated subsequent to the date last insured is not irrelevant to the issue of the Plaintiff's disability prior thereto. Further, Plaintiff argues that the ALJ should have obtained additional evidence either by re-contacting the treating source, asking the claimant to undergo a consultative examination or seeking testimony from a medical advisor.

Defendant asserts that because Plaintiff has presented no medical evidence dealing with the period prior to her last date insured, the ALJ properly found that there is no evidence in the record to support that Plaintiff had a severe impairment that prevented her from working prior to December 31, 1995.

## IV. Application of the Governing Law to the Present Facts

As set forth above, an ALJ has an affirmative duty to develop or supplement the record

when, inter alia, the evidence is ambiguous. *Webb,* 433 F.3d at 687. In the instant case, the ALJ failed to fulfill that duty. To the extent that Dr. Capobianco's opinion was unclear as to whether Plaintiff's alleged impairment existed prior to December 31, 1995, the ALJ was under a duty to seek clarification from Dr. Capobianco given that there was only three weeks between Plaintiff's last date insured and Dr. Capobianco's confirmation of Plaintiff's migraines and the presence of the Epstein-Barr virus. If necessary, the ALJ could have sought guidance – either from Dr. Capobianco or a medical consultant – as to whether it was reasonable to conclude that those impairments existed at least as of Plaintiff's last date insured.

The Court must also address the issue of whether the absence of medical treatment and/or medical records for the relevant period (i.e. from the alleged date of onset to the last date insured) precludes Dr. Capobianco (or any other doctor) from rendering a retroactive opinion. For the reasons set forth below, the Court concludes that it does not.

As stated earlier, the opinion of a treating physician as to a claimant's disability is entitled to "controlling weight" so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa,* 168 F.3d at 78-79.

In *Dousewicz v. Harris,* 646 F.2d 771 (2d Cir. 1981), the Second Circuit held that "a diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment." *Id.* at 774. Such a "retrospective diagnosis" "must be evaluated in terms of whether . . . considered in light of the entire record, it establishes the existence of a physical impairment prior to [the last date insured.]" *Id.*

Thereafter, in *Wagner v. Secretary of HHS*, 906 F.2d 856 (2d Cir. 1990) and *Rivera v.*

11

*Sullivan,* 923 F.2d 964 (2d Cir. 1991), the Second Circuit again addressed the issue of retrospective medical opinions.

In *Wagner*, the claimant alleged an onset date of September 1980 for his disabling condition, which was not diagnosed until August 1983. Although the claimant had sought medical treatment for his symptoms, a diagnosis of "hemiplegic migraine" was not made until the claimant had a stroke like episode in August 1983. Employing a hindsight rule, the claimant's treating physician opined that the claimant had this impairment all along and was permanently disabled from it since 1980. No medical evidence to contradict that opinion was offered. 906 F.2d 857-869. The ALJ rejected the hindsight contention that the disability began in 1980 and the Appeals Council affirmed. *Id.* at 860. The Second Circuit reversed and awarded benefits from 1980. The Court held that although the treating physician retrospective diagnosis was not conclusive, "a circumstantial critique by a non-physician . . . must be overwhelmingly compelling to overcome the medical opinion." *Id.* at 862.

In *Rivera,* a doctor that began treating the claimant in 1983 and testified that her impairments remained essentially the same from 1983 to the hearing. Further, relying on another doctor's records for the claimant, the testifying doctor opined that "it was most probable" that her medical condition was "approximately" the same in 1977. 923 F.2d at 966. Noting there was no medical testimony to rebut the doctor's retrospective opinion and no overwhelming non-medical evidence to the contrary, the Second Circuit held that the record did not contain substantial evidence to support the Commissioner's determination that the claimant was not disabled. *Id.* at 969.

As Defendant correctly points out, in both *Rivera* and *Wagner*, unlike here, there were

medical records for the claimant for the relevant period. Relying on *Arnone v. Bowen,* 882 F.2d 34 (2d Cir. 1989), Defendant argues that the absence of any medical records undermines the contention that Plaintiff was disabled..

In *Arnone*, the issue was whether the claimant had established a continuous period of disability from the expiration of his insured status until 12 months before he applied for benefits. The claimant presented evidence for the period 1973 to 1976 and for the period 1981 and thereafter, but presented no evidence for the period 1977 to 1980. The Second Circuit affirmed the Secretary's denial of benefits, finding substantial evidence to support the Secretary's conclusion that Arnone's condition had improved during the several years he did not visit a doctor and that he had not demonstrated a continuous period of disability. *Id.* at 41. In so holding, the Court stated as follows:

> Arnone's failure to present any medical evidence from that period seriously undermines his contention that he was continuously disabled during that time.
> Nevertheless, we are not persuaded that the dearth of contemporaneous evidence *necessarily* precludes Arnone's entitlement to a "period of disability." . . . It is true that Arnone must demonstrate that he was disabled when he claims to have been including during the gap of 1977-80. Although his task would be easier is he produced medical evidence from that period, it is conceivable that he could demonstrate such a disability without contemporaneous evidence. It is possible that evidence from earlier years could demonstrate that his condition would not improve. A finding of a subsequent continuous period of disability might have been supported by such evidence. Similarly, Arnone's post-1980 evidence is not irrelevant to the question whether he has been continuously disabled since 1977. . . . Depending on the nature of the disability, such evidence could conceivable support a finding that Arnone's condition when he visited doctors in the 1980's was the same as it has been since he injured his back in 1973, or at least since 1977.

13

*Id.* at 39 (emphasis in original). Thus, the Second Circuit in *Arnone*, acknowledged that the absence of medical evidence does not necessarily preclude a retrospective medical opinion and that medical evidence of a disability after the last date insured may provide a basis for a finding of disability before the last date insured.

In *Saviano v. Chater,* 152 F.3d 920 (2d Cir. 1998), the claimant's treating physician stated that based on the claimant's x-rays, her own examination of the claimant and her treatment of him since 1992, the claimant's condition had worsened and was permanent and existed prior to March 31, 1991. The ALJ concluded that he was not bound by the treating physician's retrospective diagnosis because it was not based upon a review of prior medical records. The Second Circuit, however, held that is was not controlling because it was contradicted by an SSA medical expert. Implicit in the *Saviano* decision is an acknowledgment that a treating physician may make a retrospective diagnosis even in the absence of medical records and that an ALJ must analyze it as a treating physician opinion. Although *Saviano* is an unpublished opinion and may not be cited for precedent, it, like the decision in *Arnone,* does indicate that the absence of medical records for the relevant period does not preclude a finding of disability. *See also Campbell v. Barnhart,* 178 F. Supp.2d 123, 134-135 (D. Conn. 2001) (rejecting ALJ's determination that medical opinion was not controlling because the treatment relationship did not begin until 1995 and the doctor's conclusion about what claimant's condition was before that date was not based on medical evidence).

Thus, on remand, the ALJ should consider Dr. Capobianco's retrospective diagnosis and accord it appropriate weight depending on, *inter alia*, whether it is uncontroverted and whether it is medically appropriate for him to render such an opinion in the absence of medical support.

## *CONCLUSION*

For all of the reasons stated above, the Commissioner's motion for judgment on the pleadings is **DENIED**; Plaintiff's motion for judgment on the pleadings is **GRANTED** to the extent that this case is remanded for further administrative proceedings consistent with this opinion. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
March 15, 2007

/s/
Denis R. Hurley
United States District Judge